IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND, *et al.*, <br><br>       *Plaintiffs*, <br><br> v. <br><br> BOYER SIGNS AND DIGITAL GRAPHICS, INC., *et al.*, <br><br>       *Defendants* | Case No. 23-cv-847-ABA |

**MEMORANDUM OPINION AND ORDER**

In this action, Plaintiffs International Painters and Allied Trades Industry Pension Fund (the "Fund"), and its fiduciary Terry Nelson (collectively, "Plaintiffs") seek to collect from Boyer Signs and Graphics, LLC ("Boyer 2") certain amounts incurred as ERISA "withdrawal liability" by Boyer Signs and Graphics, Inc. ("Boyer 1"), which ceased operation in 2013. Both sides have filed motions for summary judgment. ECF Nos. 33, 34. For the following reasons, the undisputed evidence establishes that there was substantial continuity of Boyer 1's business when Boyer 2 acquired it. But there are genuine disputes on whether Boyer 2 was on constructive notice of Boyer 1's withdrawal liability. Accordingly, both motions for summary judgment will be denied.

**I.     MATERIAL UNDISPUTED FACTS**

The following facts are undisputed. The Fund is a "defined benefit multiemployer pension fund[] established and maintained according to the Employee Retirement

1

Income Security Act of 1974" ("ERISA"). ECF No. 33-2 at 9 (citing ECF No. 33-3 at 1).[1] Boyer Signs and Graphics, Inc. ("Boyer 1") was incorporated in Ohio on August 11, 1994, ECF No. 33-4 at 2, and was dissolved on March 22, 2013. *Id.* at 7. According to its website, Boyer 1 offered sign design, fabrication, manufacturing, installation and maintenance services in the Ohio area. ECF No. 33-5 at 214. Boyer 1 worked out of a building located at 21611 Tungsten Road, Euclid, Ohio 44117 (the "Euclid Building"), a building that housed the tools, equipment, and other assets of Boyer 1. *Id.* at 27-31. Boyer 1 maintained a website at "http://boyersigns.com" and a phone line with the number "216-383-7242." *Id.* at 214. Boyer 1 was a party to collective bargaining agreements ("CBAs") with a local union affiliated with the Fund, specifically Local Union #639 of Ohio of District Council No. 6. *Id.* at 163-183; 185-210. Those CBAs obligated Boyer 1 to submit contributions to Plaintiffs. *Id.* at 180, 205. Boyer 1's final contributions were made to the Fund in February 2013. ECF No. 33-3 at 74. Boyer 1 was formally dissolved on March 26, 2013. ECF No. 33-4 at 7.

After Boyer 1's dissolution, Robert Milburn, a former employee of Boyer 1, "was working with [Bud Boyer, who owned Boyer 1] to clean out the [Euclid Building]" and was "selling off [Boyer 1's] equipment and fielding calls for the [Euclid Building]." *Id.* at 16-17. Around this time, Judy and Tim Sheehy (the "Sheehys") were looking to buy a building to store signs for a client, and they saw Milburn's advertisement for the sale of the Euclid Building. *Id.*; ECF No. 33-6 at 19-20. On December 3, 2013, the Sheehys reached out to Milburn. ECF No. 33-6 at 21-22. After the initial discussions, including

---

[1] Citations to page numbers refer to the number appearing in the CM/ECF header for this and the other filings referenced herein, which may not align with a document's original page numbering.

conversations about Boyer 1's assets, the Sheehys decided to purchase the Euclid Building. *Id.* At some point, the discussion apparently expanded to involve the sale of not only the Euclid Building, but also other assets of Boyer 1. *Id.* at 23. On December 4, 2013, Milburn and the Sheehys executed a letter of intent that "agree[d] to a good faith deposit of $5000.00" for the Euclid Building and Boyer 1's equipment, name, and client list. ECF No. 33-5 at 124. The Sheehys planned to meet Milburn and visit the Euclid Building shortly after sending this letter of intent. *Id.*

On December 12, 2013, the Sheehys (as trustees of their respective trusts) and Eileen Boyer (the then-owner, as trustee, of the real estate and personal property being sold) executed a Purchase Sale Agreement (the "Purchase Agreement"). *Id.* at 126-136. The Purchase Agreement finalized the sale of the Euclid Building, all "tangible personal property" associated with the Euclid Building, as well as all assets used in the business of Boyer 1, and "[a]ll rights to assumed contracts relating to the ownership, management, maintenance or operation of the Euclid Building and Boyer 1." *Id.* at 126; *see also* ECF No. 33-5 at 143 (Exhibit B to the purchase agreement, listing various Boyer 1 assets, including "Equipment, Name, Phone number and client list," that were being purchased as part of the transaction).

The Sheehys formed Boyer Signs and Graphics, LLC ("Boyer 2") on December 18, 2013. *Id.* at 120. The Sheehys retained Milburn as an employee of Boyer 2. *Id.* at 12. Milburn stayed on as a "project manager" and worked for Boyer 2 in the Euclid Building using the same phone number as Boyer 1. *Id.* at 30-32. Boyer 2 also used the Boyer 1 website, http://boyersigns.com. *Id.* at 74.

More than nine years went by. On March 16, 2022, Plaintiffs sent a notice and demand for payment of withdrawal liability in the amount of $208,974 to Boyer 1 based

3

on Boyer 1's withdrawal from the Fund in 2013. *Id*. at 218-220. The notice and demand letter was addressed to Boyer 2 (c/o Tim Sheehy) and sent to the Euclid Building. *Id*. at 218. The letter stated that the Fund had determined that Boyer 1 "had a complete withdrawal from" the Fund "during the 2013 Plan Year," and that Boyer 1's "single sum share of unfunded vested benefit liability [] of the Plan is $208,974." *Id*. After the parties corresponded about whether Boyer 2 is liable for Boyer 1's withdrawal liability, Plaintiffs initiated this action.

## II.     PROCEDURAL HISTORY

On March 28, 2023, Plaintiffs filed this lawsuit against Boyer 1 and Boyer 2. ECF No. 1. Boyer 2 filed an answer on June 23, 2023. ECF No. 15.[2] The Clerk entered a default against Boyer 1 on August 30, 2023. ECF No. 25. Later, Plaintiffs filed a motion for partial summary judgment. ECF No. 33. Boyer 2 responded in opposition to Plaintiffs' motion for partial summary judgment and filed its own motion for summary judgment. ECF No. 34. Plaintiffs responded in opposition to Boyer 2's motion and in support of their own motion. ECF No. 35. Boyer 2 filed a reply. ECF No. 36.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether the moving party has made that showing, the Court must consider the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

---

[2] In its answer, Boyer 2 asserted the affirmative defenses of laches and statute of limitations. Boyer 2 "is no longer pursuing its affirmative defenses related to laches and statute of limitations." ECF No. 34-2 at 9 n.1.

475 U.S. 574, 587 (1986). Where, as here, cross-motions for summary judgment have been filed, the Court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Bollech v. Charles Cnty.*, 69 F. App'x 178, 180 (4th Cir. 2003) (citation omitted).

## IV.  DISCUSSION

The only issue before the Court is whether the undisputed evidence establishes that Boyer 2 is liable, as successor to Boyer 2, for Boyer 1's withdrawal liability. ECF No. 35 at 6. For the reasons explained below, although the undisputed evidence does establish substantial continuity of the business from Boyer 1 to Boyer 2, there are genuine disputes on whether Boyer 2 was on constructive notice of Boyer 1's withdrawal liability.

### A.  Legal Standard

Congress enacted ERISA to, among other things, "ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in [them]." *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 607 (1993) (quoting *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 214 (1986)). "Congress wanted to guarantee that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he will actually receive it." *Id.* (quoting *Connolly*, 475 U.S. at 214). Congress later enacted the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381, to create withdrawal liability for employers that terminate their participation in multiemployer

5

pension plans. *Id.* at 608-09. "The MPPAA provides the procedure for calculating and assessing withdrawal liability." *Id.* at 609.

The Fourth Circuit has not explicitly discussed successor liability in the context of the MPPAA. *See Fund for Board of Trustees and the International Painters and Allied Trades Industry Pension Plan, et al. v. Hess Glass Company et al.*, No. 21-cv-2162-RDB, 2023 WL 5938604, at *3 (D. Md. Sept. 11, 2023) ("This Court's analysis of the cross motions for summary judgment relies on the doctrine of successor liability, which has not been analyzed in this Circuit in the MPPAA withdrawal liability context."). But other circuits have held that "[s]uccessor liability extends throughout federal employment law to protect federal statutory policies from corporate artifice." *Indiana Electrical Workers Pension Benefit Fund v. ManWeb Services, Inc.*, 884 F.3d 770, 776 (7th Cir. 2018). For withdrawal liability under the MPPAA, "a bona fide successor can be liable for its predecessor's MPPAA withdrawal liability" so long as (1) "the successor had notice of the liability" and (2) there was substantial continuity of the predecessor's business. *Resilient Floor Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1095 (9th Cir. 2015). If a purchaser is a successor and had notice of the withdrawal liability, courts consider a series of equitable factors to determine whether successor liability should be imposed. *Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Hawaii Pension Plan*, 891 F.3d 839, 847 (9th Cir. 2018).

### B. Substantial Continuity between Boyer 1 and Boyer 2

In determining whether there is substantial continuity between companies that are alleged to be successors, courts consider the mutuality of the ownership, physical assets, intangible assets, management, workforce, business services, and customers between the two companies. *New York State Teamsters Conf. Pension & Ret. Fund v.*

6

*C&S Wholesale Grocers, Inc.*, 24 F.4th 163, 176 (2d Cir. 2022); *ManWeb*, 884 F.3d at 777. "[T]he question of whether there is substantial continuity between a predecessor and a successor 'is primarily factual in nature and is based upon the totality of the circumstances of a given situation.'" *New York State Teamsters*, 24 F.4th at 178. "The more closely the successor models itself on its predecessor—for example, by taking over its location and offering the same services as before—the more likely it will succeed in capturing its predecessor's customers." *Resilient Floor*, 801 F.3d at 1096. This multi-factor analysis reflects the need to "balance the well-articulated federal interest in ensuring that employers maintain properly funded pension plans and the social interest in facilitating the market in corporate and other productive assets." *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325 (7th Cir. 1990). Accordingly, the Court will consider the evidence pertinent to each factor in turn.

      i.      **Mutuality of Ownership**

There is no mutuality of ownership between Boyer 1 and Boyer 2; Boyer 1 was owned by completely different individuals compared to Boyer 2. *Compare* ECF No. 33-4 at 2 *with* ECF No. 33-5 at 120. Thus, this factor weighs against a finding of substantial continuity.

      ii.      **Assets (Physical and Intangible)**

First, there exists substantial continuity as to both the physical and intangible assets between Boyer 1 and Boyer 2. Boyer 2 argues that, unlike in *ManWeb*, Boyer 2 did not obtain Boyer 1's supplier list, customer list, trade secrets, or contracts. ECF No. 34-2 at 39. Boyer 2 further argues that, even though Boyer 2 purchased Boyer 1's website, Boyer 2 changed the content of the website to the point that it was differentiated from Boyer 1's website. *Id*. at 40. Plaintiffs, on the other hand, argue that there was a

7

significant continuation of both the tangible and intangible assets from Boyer 1 to Boyer 2. Plaintiffs point out that the Sheehys "thought that the Boyer name was worth utilizing." ECF No. 33-2 at 18 (citing ECF No. 33-5 at 13). The Boyer name was priced into the Purchase Agreement. ECF No. 35 at 28; ECF No. 33-5 at 126-27, 143. And Boyer 2 retained not only the company's name, but used a nearly identical logo:

 

ECF Nos. 33-5 at 212, 214. Plaintiffs have also explained that there were not "substantial changes" made to the website. ECF No. 35 at 29. Boyer 2 continued to use Boyer 1's phone number and the Euclid Building. ECF No. 33-5 at 30-32, 74. Boyer 2 "advertised the location and fielded customer calls at the Euclid Building." ECF No. 33-2 at 20; ECF No. 33-6 at 24-25.

As in *ManWeb*, Boyer 2 "purchased [Boyer 1's] assets—especially the assets associated with goodwill and reputation—in large part because it wanted to convince customers that it was, in fact, a continuation of [Boyer 1]." *ManWeb*, 884 F.3d at 780. "The continuity of the tradename and related intangible assets, together with the intention behind it, weighs strongly in favor of continuity of business operations." *Id*. This factor weighs heavily in favor of finding substantial continuity between Boyer 1 and Boyer 2.

### iii.   Business Services

Under *ManWeb*, the continuity of business services factor is about "the fraction

8

of services previously offered by [Boyer 1] . . . that were offered by [Boyer 2] after the purchase," meaning that even if Boyer 2 offers some services that Boyer 1 did not provide, there is sufficient continuity of business services if a significant portion of Boyer 1's services were continued by Boyer 2. *Id.* at 781. Boyer 1 offered sign services in the Northeastern Ohio area for commercial customers; Boyer 2 offers that business. ECF No. 33-2 at 20-21; *compare* ECF No. 33-6 at 20-21 *with* ECF No. 33-5 at 79-80. In addition, the evidence reflects that Boyer 2 capitalized off the history and goodwill of the Boyer 1 name by advertising that Boyer 2 had been serving the Cleveland, Ohio area for 40 years, taking into account the years of experience and service of Boyer 1. *Compare, e.g.*, ECF No. 33-5 at 214 (Boyer 1 website in 2007: "A Leader in the Sign Industry for Over 37 Years!"), *with id.* at 212 (Boyer 2 website in 2012: "Serving Cleveland 40 Yrs").

Boyer 2 argues that it did not "design, manufacture or install signs *out of the Euclid Building* and the building was mostly used for storage," and that a different company owned by the Sheehys, Custom Sign Center, is the company that would design and manufacture signs based on Boyer 2's work orders. ECF No. 34-2 at 41 (emphasis added); ECF No. 33-5 at 73. Boyer 2 also argues that it was not attempting to capitalize on the history and goodwill of the Boyer 1 name but rather was making "reference to Custom Signs Center's national service area, which includes Cleveland, and its forty years of experience in the sign industry." *Id.* at 42. However, these arguments are unavailing because the purpose of the MPPAA is about the services *offered* by the successor, so it is irrelevant that Boyer 2 subcontracts certain parts of its work. *See ManWeb*, 884 F.3d at 781. And even if Boyer 2 was referring to the service area of Custom Signs Center, this does not contradict the evidence showing significant continuity of Boyer 1's services.

9

Therefore, the undisputed evidence establishes that Plaintiffs have shown a continuity of business services between Boyer 1 and Boyer 2.

### iv. Management and Workforce

The continuity of management and workforce factor focuses on the "continuity of key individuals" that enables the successor business "to offer that continuity of service." *ManWeb*, 884 F.3d at 780-81. Plaintiffs argue that the retention of Milburn was the continuation of a "key player of Boyer 1" because he "was essential to achieving and maintaining the continuity desired by the Sheehys." ECF No. 33-2 at 21-22. Boyer 2 responds that it "did not employ substantially all of [Boyer 1's] former employees." ECF No. 34-2 at 42. In making this argument, Boyer 2 cites to certain cases for the proposition that 85% or more of the workforce needs to be employed by the successor when looking at a building and construction industry exemption for withdrawal liability. *See id.* (citing *Cont'l Can Co. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund*, 916 F.2d 1154, 1155 (7th Cir. 1990), and *Resilient Floor*, 801 F.3d at 1098).

For businesses as small as Boyer 1, which had only three employees, ECF No. 35 at 30-31, using a percentage approach "will understate the continuity of the workforce" and it is more important to focus holistically on the continuity of management, supervisors, and other categories of key individuals. *ManWeb*, 884 F.3d at 780-81. However, the Court recognizes that Plaintiffs and Boyer 2 disagree as to how material Milburn was to Boyer 2's new operations, and whether Milburn was a union employee that would have been covered by the collective bargaining agreement. *Compare* ECF No. 34-2 at 43 *with* ECF No. 35 at 30-31. Therefore, this factor is neutral.

        **v.      Customer Base**

When evaluating the continuity of the customer base, courts place less emphasis on whether the successor company has captured the purchased company's customers and more on "whether the [successor] company made attempts to treat [the old company's] customers as its own." *ManWeb*, 884 F.3d at 782; *Resilient Floor*, 801 F.3d at 1096. In *ManWeb*, the Seventh Circuit concluded that while ManWeb had no interest in Freije's tangible assets, it wanted the intangible assets and the goodwill so that it could carry forward Freije's business under its own larger umbrella of services. 884 F.3d at 782. Similarly here, as explained above (*supra* § IV.B.ii-iii), the undisputed evidence establishes that Boyer 2 sought to capitalize off the goodwill and reputation of Boyer 1 to retain Boyer 1's customers and provide the same services. Boyer 2's argument that there is no proof that Boyer 2 assumed any of Boyer 1's contracts or work orders is immaterial to the analysis. The continuity of customer base between the two companies further weighs in favor of finding substantial continuity.

\*      \*      \*      \*

Taking the factors as a whole, Plaintiffs have shown that Boyer 2 is the successor of Boyer 1 based on the substantial continuity factors.

**C. Notice**

The second consideration in determining successor liability is whether the successor company had notice of the potential withdrawal liability. *Heavenly Hana*, 891 F.3d at 844. Notice can be satisfied through actual or constructive knowledge. *Id.* at 847. A successor "is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to" the discovery of the relevant information, in this case Boyer 1's withdrawal liability. *Id.* at

11

845. Constructive notice can be imposed on a purchaser if it "had an opportunity to protect itself by investigating the possible liability and negotiating a purchase price that would take it into account." *Bd. of Trustees of the Automobile Mechanics' Local No. 701 Union and Industry Pension Fund v. Full Circle Grp., Inc.*, 826 F.3d 994, 997 (7th Cir. 2016). And ignorance or failure to investigate is no excuse if constructive notice has been shown, because "[r]equiring purchasers to make reasonable inquiries into the existence of withdrawal liability advances the congressional interest in preventing underfunding in multiemployer pension plans." *Heavenly Hana*, 891 F.3d at 846 (citing *id.*).

Neither party argues that Boyer 2 had actual notice of the potential withdrawal liability; therefore, the question is whether the undisputed evidence establishes that Boyer 2 had *constructive notice* of Boyer 1's withdrawal liability. Plaintiffs argue that Boyer 2 had constructive knowledge because of the Boyer website and the Sheehys' experience and due diligence, and because Plaintiffs contend that the withdrawal liability was easily ascertainable. ECF No. 33-2 at 26-33. Boyer 2 argues that it was not on actual *or* constructive notice, and that Boyer 2's unfamiliarity with unions and pension funds justified its lack of inquiry. ECF No. 34-2 at 34-38.

Plaintiffs are correct that there were certain facts that perhaps should have put Boyer 2 on sufficient inquiry notice to trigger an obligation to investigate, and that a reasonable investigation may have revealed the existence of Boyer 1's withdrawal liability. For example, the Boyer 1 website displayed a logo showing that Boyer 1 was a member of the union and the Fund. ECF No. 33-5 at 214. There is also evidence that Boyer 2 specifically sought to purchase the website, and included it explicitly in its Purchase Agreement as an asset it was acquiring. ECF No. 33-2 at 26. Moreover, Boyer 2

12

admitted in its Rule 30(b)(6) deposition that "union labor is everywhere." ECF No. 33-6 at 18 ("Q. Were you aware of other companies in those areas that we just went through utilizing union labor? A. I think union labor is everywhere. So, you know, I mean, I know it's in 14 Columbus, Ohio. I know it's everywhere."). And although Boyer 2 contends that it only conducted due diligence as to the Euclid Building and not Boyer 1's other assets because it "did not intend to buy [Boyer 1] and [Boyer 1] had been closed for nearly two years anyway," ECF No. 34-2 at 37, Boyer 2 *did* go on to purchase various of Boyer 1's assets including its "Name, Phone number and client list." ECF No. 33-5 at 143.

But Boyer 2 vigorously disputes whether any of that information was sufficient to warrant an investigation into whether Boyer 1 owed withdrawal liability to the Fund. For example, Boyer 2 argues the union logo was too small to put it on notice of the withdrawal liability. And indeed, the evidence in the record shows that the union logo was very small. ECF No. 34-4 at 82. Ms. Sheehy, as Boyer 2's Rule 30(b)(6) representative, testified that she was unfamiliar with the logo and the union. *Id.* at 82-83. She also testified that Boyer 2 did not learn anything during the acquisition negotiations that would have alerted them to the presence of a union or a CBA. *Id.* at 46-47, 49-50.

A reasonable factfinder may ultimately conclude that Boyer 2 had sufficient information to trigger a duty to inquire into whether Boyer 1 owed withdrawal liability to the Fund. But there are genuine disputes about the facts material to that determination. Accordingly, neither party is entitled to summary judgment.

### D. Equitable Factors

"Even when the requirements for constructive notice are met, in certain instances

fairness could militate against imposing successor liability." *Heavenly Hana*, 891 F.3d at 847. "Because the origins of successor liability are equitable, fairness is a prime consideration in its application." *Resilient Floor*, 801 F.3d at 1091. Plaintiffs argue that applying successor liability to Boyer 2 is appropriate because Boyer 2 benefited from acquiring Boyer 1 and successor liability is appropriate to prevent Boyer 2 from obtaining a windfall. ECF No. 33-2 at 33-34. Boyer 2 argues that it did not receive a windfall, and that Boyer 2 "simply lacked any knowledge related to the impending liability and could not take the appropriate measures to compensate or shield itself from [Boyer 1's] withdrawal liability." ECF No. 34-2 at 46-47. With respect to the windfall argument specifically, Boyer 2 argues that much of the equipment it received through the Purchase Agreement either did not work or was unusable. *Id.* at 46.

Because the Court is denying the motions for summary judgment due to the genuine disputes on the question of constructive notice, the Court will defer deciding whether the equitable factors would justify imposing Boyer 1's withdrawal liability on Boyer 2.

## CONCLUSION AND ORDER

For the foregoing reasons, Plaintiffs' motion for partial summary judgment, ECF No. 33, and Boyer 2's motion for summary judgment, ECF No. 34, are both DENIED. Within 21 days of this order, the parties shall file a joint status report regarding (a) a requested timeframe for a bench trial, (b) whether the parties request referral to a Magistrate Judge for a settlement conference.

Date:    March 31, 2025                                    _____*/s/*_____

Adam B. Abelson
United States District Judge